# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jennifer Kathleen Rickards | : | |
| | : | |
| v. | : | No. 1225 C.D. 2019 |
| | : | Submitted: February 21, 2020 |
| Commonwealth of Pennsylvania, | : | |
| Department of Transportation, | : | |
| Bureau of Driver Licensing, | : | |
| Appellant | : | |


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**             **FILED: May 26, 2020**

The Commonwealth of Pennsylvania, Department of Transportation, Bureau of Driver Licensing (DOT) appeals from the August 16, 2019 Order of the Court of Common Pleas of Bucks County (common pleas)[1] setting aside a one-year suspension of Jennifer Kathleen Rickards's (Licensee) operating privilege imposed

---

[1] Common pleas' Order and accompanying Opinion in this matter are dated August 12, 2019. The Order and Opinion were docketed on August 15, 2019, and appear to have been transmitted to the parties on August 16, 2019. (Reproduced Record at 1a.) Pursuant to Pennsylvania Rule of Appellate Procedure 108(b), Pa.R.A.P. 108(b), the date of entry of an order "in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by" Pennsylvania Rule of Civil Procedure 236(b), Pa.R.C.P. No. 236(b). Since the Order in this case was transmitted to the parties on August 16, 2019, the Order was entered as of that date. Regardless of the Order's date, DOT's appeal was timely filed.

by DOT pursuant to Section 1547(b)(1)(i) of the Vehicle Code, 75 Pa.C.S. § 1547(b)(1)(i), commonly referred to as the Implied Consent Law.[2] On appeal, DOT contends that common pleas erred as a matter of law by holding that Licensee did not refuse a request for a blood test and, therefore, DOT's suspension of Licensee's operating privilege should have been upheld because it met its burden to sustain the suspension. Upon review, we are constrained by our precedent to conclude Licensee did refuse a chemical test of her blood. Accordingly, we reverse.

## I. Factual Background and Procedure

On October 18, 2018, Licensee was arrested for driving under the influence (DUI), at which time Officer Drakeley of the Upper Southampton Township Police Department read Licensee the warnings outlined in DOT's DL-26B Form. The warnings outlined in the DL-26B Form, commonly referred to as the *O'Connell*[3] warnings or the Implied Consent Warnings, read, in pertinent part, as follows:

> 1. You are under arrest for driving under the influence of alcohol or a controlled substance in violation of Section 3802 of the Vehicle Code[, 75 Pa.C.S. § 3802].

---

[2] The Implied Consent Law provides, in relevant part, that:

(1) If any person placed under arrest for violation of [S]ection 3802 [of the Vehicle Code, 75 Pa.C.S. § 3802 (relating to driving under the influence of alcohol or controlled substance),] is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, [DOT] shall suspend the operating privilege of the person as follows:

(i) Except as set forth in subparagraph (ii), for a period of 12 months.

. . . .

75 Pa.C.S. § 1547(b)(1)(i).

[3] *Dep't of Transp., Bureau of Traffic Safety v. O'Connell*, 555 A.2d 873 (Pa. 1989).

2. I am requesting that you submit to a chemical test of blood.

3. If you refuse to submit to the blood test, your operating privilege will be suspended for at least 12 months. If you previously refused a chemical test or were previously convicted of [DUI], your operating privilege will be suspended for up to 18 months. If your operating privilege is suspended for refusing chemical testing, you will have to pay a restoration fee of up to $2,000 in order to have your operating privilege restored.

4. You have no right to speak with an attorney or anyone else before deciding whether to submit to testing. If you request to speak with an attorney or anyone else after being provided these warnings or you remain silent when asked to submit to a blood test, you will have refused the test.

(Reproduced Record (R.R.) at 92a.) After being read the Implied Consent Warnings, Officer Drakeley asked Licensee whether she would consent to a chemical test of her blood. It is undisputed that Licensee responded by asking whether she could read the form herself. Officer Drakeley allowed Licensee to read the form for a short period of time and then asked Licensee multiple times whether she would consent to a chemical test of her blood. It is also undisputed that Licensee was silent in response to Officer Drakeley's multiple inquiries as to whether Licensee would consent to a chemical test. Officer Drakeley treated Licensee's silence as a refusal to consent and transported her to the police department for processing. Thereafter, by letter with a mailing date of November 1, 2018, DOT suspended Licensee's operating privilege for a period of one year effective December 6, 2018, pursuant to the Implied Consent Law, for Licensee's refusal to submit to a chemical test on October 18, 2018. (*Id.* at 8a-11a.)

Licensee appealed the suspension to common pleas, which held a hearing on May 23, 2019. At the hearing, Officer Drakeley, his backup, Officer Bankert, and

3

Licensee testified. Officer Drakeley testified as follows. On October 18, 2018, at approximately 3:00 a.m., Officer Drakeley observed a vehicle that he thought was speeding. After following the vehicle for some time, Officer Drakeley initiated a traffic stop and made contact with Licensee. Upon making contact with Licensee, Officer Drakeley "detected an odor of an alcoholic beverage emanating from the vehicle." (Hearing Transcript (Hr'g Tr.) at 9.) After obtaining Licensee's license, registration, and an expired insurance card, Officer Drakeley went back to his patrol car to run Licensee's information. When he returned to Licensee's vehicle, he again "detected a strong odor of alcoholic beverage emanating from the vehicle." (*Id.* at 10.) Officer Drakeley testified that he asked Licensee if she had been drinking, to which she responded by stating that she had two drinks the previous evening, October 17, 2018, at 6:00 p.m.

Officer Drakeley further testified that he had Licensee exit her vehicle to perform field sobriety tests. First, Officer Drakeley requested Licensee perform a walk-and-turn test. Officer Drakeley testified that Licensee told him that she had issues with her left ankle and right knee but that she would attempt the test. Licensee had difficulty with the test, having attempted the test before being asked, and "eventually was unable to complete the test due to her ankle and knee issues." (*Id.* at 11.) Officer Drakeley then asked Licensee to perform a one-leg stand, which Licensee stated she could not perform due to the issues with her left ankle and right knee. At this point, Officer Drakeley testified, Officer Bankert conducted a horizontal gaze nystagmus test (HGN). After the HGN, Officer Drakeley performed a preliminary breath test, to which Licensee voluntarily submitted. Officer Drakeley testified that Licensee "was providing [] insufficient samples" for the test, "at which

4

point Officer Bankert took over, and [] was able to get a sufficient sample from the [Licensee], which indicated a positive reading of .146 percent."[4] (*Id.* at 13.)

Following the breath test, Officer Drakeley arrested Licensee, placed her in the back of his patrol car, and read the DL-26B Form to her. Officer Drakeley testified that he

> read the entire form verbatim to [Licensee] and asked her twice if she would submit to a chemical test of blood. [Licensee] began to ask questions about the test - - or, excuse me, about the form and asked several times to read it herself.
>
> I informed her that I did not need to allow her to read it, but I gave her approximately 30 seconds to look it over. During that time, she read the portion out loud about not having the right to speak with an attorney at this time. After about 30 seconds, I asked her again, twice more, if she would submit to the test. She continued to ask more questions. And then a third time, I told her I needed a yes-or-no answer right now at that moment. [Licensee] remained silent, and I interpreted that as a refusal.

(*Id.* at 13-14.) Officer Drakeley stated that when Licensee was reading the DL-26B Form, it was dark but there were illuminated streetlights. Later in his testimony, Officer Drakeley clarified that when he handed Licensee the DL-26B Form, she "was silent for the first 20 or so seconds and then began to read" the fourth and final paragraph of the Implied Consent Warnings "out loud over the last 30" seconds. (*Id.* at 28.) He stated that when he asked Licensee the final time if she would consent to the chemical test, he felt comfortable that she had finished reading the DL-26B Form because she had been reading the final paragraph aloud. (*Id.* at 31.) After interpreting Licensee's silence as a refusal, Officer Drakeley transported Licensee

---

[4] Pursuant to Section 3802(a)(2) of the Vehicle Code, a licensee "may not drive . . . a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the [licensee]'s blood or breath is at least 0.08% . . . ." 75 Pa.C.S. § 3802(a)(2).

5

to the police department. At the police department, Licensee and Officer Drakeley signed the DL-26B Form. Officer Drakeley testified that he could not recall if Licensee stated, at the police department, that she would consent to the test but that if she had stated such at the police department he would not have conducted the chemical test because once a licensee refuses at the time of arrest, it is departmental policy to not conduct the test if a licensee later consents at the police department.

Following Officer Drakeley's testimony, Officer Bankert testified as follows. After Officer Drakeley initiated the stop of Licensee, Officer Bankert responded to the scene to assist. Upon arrival, he conducted the HGN. Based upon the indicators from the HGN, Officer Bankert was "confident that [Licensee's] blood alcohol concentration would be in excess of .08 percent." (*Id.* at 39.) He then testified that Officer Drakeley attempted to perform a preliminary breath test but Licensee provided insufficient samples. Officer Bankert then administered the breath test. Licensee provided sufficient samples for the breath test conducted by Officer Bankert, which indicated ".146 percent blood alcohol concentration." (*Id.* at 40.) Officer Bankert, like Officer Drakeley, testified that it was departmental policy to not allow a licensee to submit to a chemical test at the police department after the licensee refused the test at the time of the arrest. As to the actual blood test, Officer Bankert stated that the chemical tests were actually conducted by the local emergency medical services unit, neighboring departments, or, if need be, a local hospital.

Licensee then testified as follows. After being pulled over by Officer Drakeley, she attempted to perform field sobriety tests but was unable to complete the walk-and-turn test due to "surgical problems." (*Id.* at 43.) Following the field sobriety tests, Licensee was arrested and placed in the back of a patrol car where

6

Officer Drakeley read the DL-26B Form. In response, Licensee "asked to read the form." (*Id.* at 44.) Licensee testified that she "kn[e]w what" Officer Drakeley said when he read the DL-26B Form, but that she "would like to read the" form for herself. (*Id.*) At that point, Officer Drakeley allowed Licensee to read the form "for a very short amount of time" but interrupted her reading two or three times to ask "do you consent?" (*Id.*) Licensee stated that "[o]nce [she] got to the fourth paragraph, [she] [] start[ed] to read out loud so that [she] could hear [her]self think and the paper was taken from [her]. [] [O]fficer [Drakeley] said, sounds like a refusal to me and slammed the door." (*Id.*) She stated that she never verbally consented to the test but that she also never verbally refused the test. (*Id.* at 46, 48.) Licensee testified that once she was processed at the police station, before signing the DL-26B Form, she asked "well, what if I take it now? What if I go?" To which Officer Drakeley responded by stating "no, it was a one-shot deal, so you have to sign the paper." (*Id.* at 45.)

After the hearing, common pleas issued its August 16, 2019 Order setting aside DOT's suspension of Licensee's operating privilege. In its accompanying Opinion, common pleas held that DOT did not meet its burden to sustain the suspension of Licensee's operating privilege. Specifically, common pleas held that DOT did not meet its burden of demonstrating Licensee refused a chemical test of her blood. Relevant to this issue, common pleas found that after Licensee's arrest for DUI, Officer Drakeley

> placed [Licensee] in [his] patrol car and read the DL-26 [F]orm to her verbatim once. [Officer] Drakeley asked her if she would submit to the blood test, to which [Licensee] responded by asking questions related to the testing requirement, and specifically asking whether she could be permitted to read the DL-26B [Form] herself. [Officer] Drakeley handed her the form and asserted that while he was not required to let her read it[,] he would permit her to do so.

7

At this time, [Licensee] was in the back of the patrol car with no illumination except nearby streetlights. [Licensee] was also handcuffed. [Licensee] read silently for approximately twenty seconds. After that twenty seconds, [Licensee] began to read aloud the four paragraphs on the DL-26B [Form] warning of the consequences of refusal. Partway through doing so, and within ten seconds of her starting to read aloud, [Officer] Drakeley twice interrupted to demand whether she consented to the test. Because [Licensee] continued reading the form instead of responding, and based on her having asked questions the nature of which he does not recall, [Officer] Drakeley decided that [Licensee] had refused testing.

(Common pleas' Opinion (Op.) at 2 (citations omitted).) Based upon the above findings, common pleas concluded that Licensee

cannot be said to have chosen to decline chemical testing by failing to respond to a police officer's inquiry about a form that she was still reading, less than a minute after it had been handed to her. Such a swift declaration of refusal is particularly unreasonable in light of the totality of [Licensee]'s conduct, which included freely submitting to multiple different balance-related field sobriety tests, a field sobriety eye test[,] and chemical breath testing.

(*Id.* at 3.) DOT then filed a Notice of Appeal on September 5, 2019. Thereafter, common pleas ordered DOT to file a concise statement of errors complained of on appeal. After DOT filed the foregoing, common pleas issued an opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1925(a), in support of its August 16, 2019 Order. In its 1925(a) Opinion, common pleas wrote that Licensee's

overall conduct did not amount to an unwillingness to consent [to the chemical test of her blood]. To the contrary, [Licensee] freely submitted to multiple different balance-related field sobriety tests, a field sobriety eye test[,] and chemical breath testing. []DOT bases its claim that [Licensee] refused testing on her failure to affirmatively respond to [Officer] Drakeley's request that she submit to chemical

8

analysis of her blood, asked while she was in the middle of reading the form, having been handed it less than a minute earlier. At the very least, [Licensee]'s conduct demonstrated her focus on reading the form at night under artificial lighting to be able to respond [t]o [Officer] Drakeley's distracting interruptions. [Licensee] was clearly considering consent by her careful review of the DL-26B warnings and her inquiries about the testing requirements at the time the officer made the determination she was refusing to consent.

(1925(a) Op. at 5.) Further, common pleas wrote that Licensee "cannot be said to have chosen to decline chemical testing" because Licensee was not given a meaningful opportunity to comply with Officer Drakeley's request that she submit to a chemical test of her blood. (*Id.*) Accordingly, common pleas ended its 1925(a) Opinion by stating that it properly set aside DOT's suspension of Licensee's operating privilege.

## II.     Discussion

As set forth above, on appeal,[5] DOT argues common pleas erred as a matter of law by holding that Licensee did not refuse a chemical test of her blood. Preliminarily, before we turn to the parties' arguments, we note that in order to sustain the operating privilege suspension against Licensee, DOT bears the burden of demonstrating that Licensee:

(1) was arrested for DUI by a police officer with reasonable grounds to believe . . . [Licensee] was operating a vehicle while under the influence of alcohol or a controlled substance; (2) was requested to submit to chemical testing; (3) refused to submit to chemical testing; and (4) was

---

[5] "Our standard of review is whether [common pleas'] findings are supported by [substantial] competent evidence and whether [common pleas] committed an error of law or an abuse of discretion." *Drudy v. Dep't of Transp., Bureau of Driver Licensing*, 795 A.2d 508, 510 n.5 (Pa. Cmwlth. 2002). For questions of law, our scope of review is plenary. *Whitaker v. Wetzel*, 170 A.3d 568, 572 n.3 (Pa. Cmwlth. 2017).

warned by [an] officer that her license will be suspended if she refused to submit to chemical testing.

*Park v. Dep't of Transp., Bureau of Driver Licensing*, 178 A.3d 274, 280 (Pa. Cmwlth. 2018). "In proving whether [] [L]icensee refused to submit to chemical testing, DOT has the burden of showing that [] [L]icensee was offered a meaningful opportunity to comply with" Officer Drakeley's request that Licensee submit to a chemical test of her blood. *Broadbelt v. Dep't of Transp., Bureau of Driver Licensing*, 903 A.2d 636, 640 (Pa. Cmwlth. 2006). Once DOT demonstrates the foregoing, the burden then shifts to "[L]icensee to prove she was physically incapable of performing the test or that her refusal was not knowing and conscious." *Park*, 178 A.3d at 280.

Further, we also note that in reviewing common pleas' August 16, 2019 Order and Opinion, we are guided by the well-established principle that "it is not the province of this Court to make new or different findings of fact." *Reinhart v. Dep't of Transp., Bureau of Driver Licensing*, 954 A.2d 761, 765 (Pa. Cmwlth. 2008). Our role in operating privilege suspension cases is limited to reviewing common pleas' findings of fact "to determine if they are supported by substantial, competent evidence." *Id.* If common pleas' factual findings are supported by substantial evidence, "we are precluded from overturning those findings." *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Helwig v. Dep't of Transp., Bureau of Driver Licensing*, 99 A.3d 153, 159 (Pa. Cmwlth. 2014). We must view the evidence in this matter in a light most favorable to Licensee, "the party that prevailed before" common pleas. *Bradish v. Dep't of Transp., Bureau of Driver Licensing*, 41 A.3d 944, 945 n.3 (Pa. Cmwlth. 2012). Additionally, "[d]eterminations as to the credibility of witnesses and the weight assigned to the evidence are solely within the province of the trial

10

court as fact-finder." *Reinhart*, 954 A.2d at 765. With these principles in mind, we turn to the parties' arguments.

Before this Court, DOT argues it satisfied its burden to sustain the suspension of Licensee's operating privilege. DOT contends common pleas' "findings of fact are supported by competent evidence" but that common pleas "erred as a matter of law in holding that [Licensee] did not refuse Officer Drakeley's request for a blood test." (DOT's Brief (Br.) at 22.) DOT argues that based upon the facts found by common pleas, Licensee refused a chemical test of her blood on October 18, 2018. As support, DOT emphasizes that common pleas found that after Officer Drakeley read the Implied Consent Warnings to Licensee and requested that she submit to a chemical test, Licensee "responded by asking questions related to the testing requirement, and specifically asking whether she could be permitted to read the DL-26B [Form] herself." (*Id.* at 26 (citing common pleas' Op at 2).) Based upon our precedent, DOT avers that as a matter of law, Licensee refused Officer Drakeley's request for a chemical test by asking questions following his reading of the Implied Consent Warnings. As to common pleas' finding that Licensee was not afforded a meaningful opportunity to submit to the requested blood test, DOT asserts that "as [Licensee] already had refused Officer Drakeley's request for a blood test, [Licensee] was not denied a meaningful opportunity to consent to chemical testing when Officer Drakeley did not permit [Licensee] to read the warnings for as long a period of time as she desired." (DOT's Br. at 20.)[6]

---

[6] DOT also argues in its brief, citing *McKenna v. Department of Transportation, Bureau of Driver Licensing*, 72 A.3d 294 (Pa. Cmwlth. 2013), that if Licensee had agreed to submit to a chemical test of her blood at the police department, this does not "vitiate her refusal at the scene of her DUI arrest" because once a licensee refuses testing, that licensee's refusal cannot later be vitiated by agreeing. (DOT's Br. at 30.) However, common pleas made no specific factual findings with respect to whether Licensee agreed to submit to a chemical test of her blood at the police department. As such, this issue is not before this Court.

11

Licensee agrees that common pleas' "findings of fact were supported by the record" but, unlike DOT, contends common pleas did not err as a matter of law by concluding DOT failed to establish Licensee refused a chemical test of her blood because Licensee was not given a meaningful opportunity to consent. (Licensee's Br. at 7.) Based upon the facts found by common pleas, Licensee concludes that her overall conduct demonstrates that she was cooperative and did not intend to refuse the chemical test. Licensee admits to asking questions after Officer Drakeley read the DL-26B Form to her but asserts that "contrary to [] [DOT]'s draconian interpretation . . . merely asking a question of a police officer does not constitute a refusal as a matter of law." (*Id.* at 11.) As to whether Licensee was provided a meaningful opportunity to consent to the chemical test, Licensee argues that she was not provided a meaningful opportunity because Officer Drakeley took the DL-26B Form from her while she was reading it.[7]

Based upon the facts found by common pleas, which are supported by the record, it is clear that Licensee was arrested for DUI, was then read the Implied Consent Warnings by Officer Drakeley, and was subsequently asked to submit to a chemical test of her blood. As such, the only question that remains in determining

---

[7] Licensee also appears to argue, citing Officer Bankert's testimony regarding the fact that the Upper Southampton Township Police Department did not itself perform the chemical tests for licensees arrested for DUI, that she was not provided a meaningful opportunity to consent to the chemical test because it was unclear whether "the appropriate arrangements would have been made" by the police department so that "chemical testing could actually have occurred." (Licensee's Br. at 14.) It is unclear to this Court why Licensee would be deprived of a meaningful opportunity to consent by an inability of the Upper Southampton Township Police Department's ability to conduct the chemical test. The crux of this issue is whether Licensee was given a meaningful opportunity to contemplate and consent to a chemical test of her blood. Whether or not the police department had the ability to conduct the chemical test is not relevant to the question of whether Licensee had the meaningful opportunity to consent.

whether to sustain the suspension of Licensee's operating privilege is whether Licensee "refused to submit to chemical testing." *Park*, 178 A.3d at 280.

"The question of whether a licensee refuses to submit to a chemical test is a legal one, based on the facts found by the trial court." *Nardone v. Dep't of Transp., Bureau of Driver Licensing*, 130 A.3d 738, 748 (Pa. 2015). "The trial court initially finds the facts surrounding the performance of the test. The issue of whether there was a refusal is a question of law and reviewable by this Court." *Mueller v. Dep't of Transp., Bureau of Driver Licensing*, 657 A.2d 90, 92 (Pa. Cmwlth. 1995). This question turns on whether the licensee's "overall conduct demonstrates an unwillingness to assent to an officer's request for chemical testing." *Nardone*, 130 A.3d at 749. "A 'refusal' is 'anything substantially less than an unqualified, unequivocal assent to [submit to] a [chemical] test . . . . A refusal need not be expressed in words, but can be implied from a motorist's actions.'" *Lanthier v. Dep't of Transp., Bureau of Driver Licensing*, 22 A.3d 346, 348 (Pa. Cmwlth. 2011) (quoting *Dep't of Transp., Bureau of Traffic Safety v. Mumma*, 468 A.2d 891, 892 (Pa. Cmwlth. 1983)).

Here, common pleas concluded Licensee was not given a meaningful opportunity to comply with Officer Drakeley's request that she submit to a chemical test of her blood and, therefore, common pleas determined Licensee cannot be said to have refused the chemical test. However, this is not consistent with our precedent. Viewing the evidence in a light most favorable to Licensee, as we must, we agree with DOT that Licensee was provided a meaningful opportunity to submit to the chemical test. In reaching this decision, we conclude this case is similar to *Broadbelt*.

13

In *Broadbelt*, the licensee was arrested for DUI, at which time he was read the Implied Consent Warnings twice by a police officer. In response, the licensee requested to read the Implied Consent Warnings for himself, which the police officer allowed the licensee to do. After giving the DL-26 Form to the licensee, the police officer "asked [the] [l]icensee three times to submit to a chemical test, but each time [the] [l]icensee neither answered nor indicated that he did not understand the DL-26 Form." *Broadbelt*, 903 A.2d at 638. The police officer treated the licensee's silence as a refusal to submit to the chemical test. The foregoing exchange, between when the police officer read the Implied Consent Warnings and when the police officer deemed the licensee's silence a refusal, lasted 12 minutes. Thereafter, DOT suspended the licensee's operating privilege, which the trial court sustained. On appeal to this court, the licensee argued that he was not given a meaningful opportunity to comply with the request to submit to a chemical test. Specifically, the licensee argued he was not given a meaningful opportunity to comply "due to the short amount of time he was given to consider" the Implied Consent Warnings and due to a distraction while he was considering whether to consent. *Id.* at 640. We disagreed, holding that the licensee was given a meaningful opportunity to comply with the request. We reasoned that the "[l]icensee had approximately twelve minutes to consider the [Implied Consent W]arnings" and the licensee "never indicated that he did not understand the warnings, that he needed more time to review the warnings or that" he was being distracted while considering the warnings. *Id.* at 641.

In the present matter, Licensee, after her arrest for DUI, was read the DL-26B Form and asked whether she would submit to a chemical test of her blood. Licensee "responded by asking questions related to the testing requirement, and specifically

14

asking whether she could be permitted to read the DL-26B [Form] herself." (Common pleas' Op. at 2.) Officer Drakeley allowed Licensee to read the DL-26B Form for a short period of time before asking her at least twice whether she would consent to a chemical test of her blood. (*Id.*) Like the licensee in *Broadbelt*, Licensee remained silent in response to these requests. (Common pleas' Op. at 2.) While Licensee's consideration of the written Implied Consent Warnings was considerably shorter than the licensee in *Broadbelt*, this does not mean Licensee did not have a meaningful opportunity to consent. Licensee, like the licensee in *Broadbelt*, was given multiple opportunities to consent to the chemical test. After being read the DL-26B Form, Licensee was asked twice whether she would consent to the chemical test. After being allowed to read the DL-26B Form for herself, Licensee was then asked at least twice more whether she would consent to the chemical test.

Common pleas determined that Licensee "cannot be said to have chosen to decline chemical testing by failing to respond to a police officer's inquiry about a form that she was still reading, less than a minute after it had been handed to her." (Common pleas Op. at 3.) However, as in *Broadbelt*, "Licensee never indicated" to Officer Drakeley that she "needed more time to review the" DL-26B Form or that she was distracted while reading it. 903 A.2d at 641. If Licensee wanted to request more time to read and consider the Implied Consent Warnings, she could have informed Officer Drakeley of that instead of remaining silent or indicated that she was distracted while reading the DL-26B Form due to Officer Drakeley's inquiries regarding whether she would consent to the chemical test.

Furthermore, Officer Drakeley was not required to allow Licensee to read the DL-26B Form in the first place, which he informed her when handing Licensee the

15

form. It is well-settled that all that is required by an officer under the Implied Consent Law is that the officer read the Implied Consent Warnings to a licensee. *Park*, 178 A.3d at 281. Stated differently, "[o]nce a police officer provides the [I]mplied [C]onsent [W]arnings to a motorist, the officer has done all that is legally required to ensure the [licensee] is fully advised of the consequences of [the licensee's] failure to submit to chemical testing." *Id.* "In particular, officers do not have an obligation to make sure that licensees understand the [Implied Consent W]arnings or the consequences of a refusal," such as by allowing licensees the opportunity to read the DL-26B Form for themselves. *Id.* We squarely addressed this issue in *Blythe v. Department of Transportation, Bureau of Driver Licensing* (Pa. Cmwlth., No. 834 C.D. 2016, filed June 1, 2017).[8] In *Blythe*, the licensee argued to this Court that "meaningful opportunity," in operating privilege suspension cases, "includes an opportunity to read the [DL-26] [F]orm in its entirety and have time to consider the warnings." Slip op. at 4. We concluded that there is **no requirement** in the Implied Consent Law that a "licensee be provided an opportunity to read the form," reasoning that "[t]he duty to inform the licensee of the consequences of refusal rests solely on the officer." *Id.* at 6. As such, Licensee cannot be said to have been deprived of a meaningful opportunity to comply with Officer Drakeley's request that she consent to a blood test based upon the rationale that she was not afforded as much time as she would have liked to read the DL-26B Form because Officer Drakeley, under the Implied Consent Law, was not obligated to allow Licensee to read the form in the first place. *Id.*

---

[8] Pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 126(b), and Section 414(a) of the Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), unreported panel decisions of this Court may be cited for their persuasive value.

Licensee was fully apprised of the Implied Consent Warnings, testifying that she "kn[e]w what" Officer Drakeley said when he read the DL-26B Form. (Hr'g Tr. at 44.) Additionally, when handed the DL-26B Form, Licensee read silently for approximately 20 seconds and then began reading the fourth and final paragraph aloud, evidencing that Licensee had finished reading the Implied Consent Warnings when her silence was deemed a refusal. (Common pleas' Op. at 2.) Therefore, Licensee cannot be said to have not been informed of her rights before being asked if she would consent to a chemical test of her blood. In light of these facts we conclude Licensee was given a meaningful opportunity to comply with the request to submit to a chemical test because Licensee was asked, at least four times, whether she would consent to a chemical test of her blood and had the opportunity to consent each time.

Having determined that Licensee was provided with a meaningful opportunity to comply with Officer Drakeley's request that she submit to a chemical test of her blood, we now turn to the question of whether Licensee refused the chemical test. DOT contends Licensee refused to submit to the chemical test by asking questions after Officer Drakeley read the DL-26B Form aloud. We agree. We have consistently held that "[r]epeated questioning may [] be deemed a refusal by conduct." *Park*, 178 A.3d at 281. Here, common pleas found that when Officer Drakeley read Licensee the DL-26B Form, Licensee "**responded by asking questions** related to the testing requirement, and specifically asking whether she could be permitted to read the DL-26B [Form] herself." (Common pleas' Op. at 2 (emphasis added).) Based upon this factual finding, by which we are bound, Licensee, as a matter of law, refused Officer Drakeley's request that she submit to a chemical test of her blood by asking questions rather than providing her consent to

17

the test. *Lanthier*, 22 A.3d at 348. We acknowledge that Officer Drakeley did not treat Licensee's questions as a refusal. However, whether an action constitutes a refusal is a question of law. *Mueller*, 657 A.2d at 92. Therefore, we are not bound by Officer Drakeley's determination at the time of the arrest.

Further, even assuming, *arguendo*, that Licensee's questions in response to being read the Implied Consent Warnings did not constitute a refusal, her silence, after being asked at least twice more whether she would consent to the chemical test, independently constitutes a refusal. Notwithstanding the fact that Licensee had been read the Implied Consent Warnings by Officer Drakeley, Licensee was permitted to read the Implied Consent Warnings herself, which she read for approximately 20 seconds before reading the final paragraph aloud. The fact that Licensee was reading the final paragraph aloud evidences her having finished reading the warnings to herself. Having been fully apprised of her rights both by Officer Drakeley and by reading the Implied Consent Warnings herself, Licensee, like the licensee in *Broadbelt*, chose to remain silent when asked whether she would consent to the chemical test. Licensee did not inform Officer Drakeley that she was not finished reading the DL-26B Form or that she was distracted while reading it. We have consistently held that silence can constitute a refusal. *Grogg v. Dep't of Transp., Bureau of Driver Licensing*, 79 A.3d 715, 719 (Pa. Cmwlth. 2013). Therefore, Licensee refused Officer Drakeley's subsequent requests that she consent to a chemical test by remaining silent.

Notwithstanding the above, the fact that Officer Drakeley later asked Licensee if she would consent to a chemical test of her blood does not waive Licensee's first refusal. As stated above, after being handed the DL-26B Form to read, albeit for a short period of time, Officer Drakeley asked Licensee, at least twice, whether she

18

would consent to a chemical test of her blood. Officer Drakeley's subsequent inquiries as to whether Licensee would take the test "were at most gratuitous" because Licensee had already refused the test by asking questions in response to being asked twice whether she would consent to a chemical test. *Olbrish v. Dep't of Transp., Bureau of Driver Licensing*, 619 A.2d 397, 399 (Pa. Cmwlth. 1992). Licensee chose not to avail herself of Officer Drakeley's subsequent inquiries by remaining silent when he asked her whether she would consent to a chemical test of her blood. As such, "no waiver of the first refusal occurred, because Licensee did not successfully complete any testing." *Jackson v. Dep't of Transp., Bureau of Driver Licensing*, 191 A.3d 931, 937 (Pa. Cmwlth. 2018).[9]

Accordingly, we conclude that common pleas erred in holding that DOT did not meet its burden of demonstrating that Licensee refused a chemical test of her blood on October 18, 2018.

### III. Conclusion

For the foregoing reasons, we are constrained to conclude that common pleas erred in concluding that Licensee was not given a meaningful opportunity to comply with a request for a chemical test of her blood. Licensee was given multiple opportunities to consent to a chemical test but chose not to do so. We also conclude that Licensee refused the chemical test by not giving her unequivocal assent when asked multiple times whether she would consent to the test. As such, we hold DOT met its burden to sustain the suspension of Licensee's operating privilege. Accordingly, we reverse common pleas' August 16, 2019 Order setting aside the

---

[9] Even if Licensee did later consent to the chemical test of her blood at the police department, this was after her refusal, and "the law is well-settled that once a licensee has refused, the refusal cannot be vitiated by a later assent." *McKenna*, 72 A.3d at 297 n.4.

19

suspension of Licensee's operating privilege and reinstate DOT's suspension of Licensee's operating privilege.

 

 

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jennifer Kathleen Rickards      :
     :
         v.      :    No. 1225 C.D. 2019
     :
Commonwealth of Pennsylvania,      :
Department of Transportation,      :
Bureau of Driver Licensing,      :
               Appellant      :

# O R D E R

**NOW**, May 26, 2020, the August 16, 2019 Order of the Court of Common Pleas of Bucks County is hereby **REVERSED**. Accordingly, the suspension of Jennifer Kathleen Rickards's operating privilege by the Commonwealth of Pennsylvania, Department of Transportation, Bureau of Driver Licensing is hereby **REINSTATED**.

 

_____
**RENÉE COHN JUBELIRER,** Judge